**HARDWARE MUTUAL CASUALTY COMPANY, Appellant,**

v.

**Claudine COURTNEY et vir, Appellees.**

**No. 10908.**

Court of Civil Appeals of Texas.

Austin.

Jan. 3, 1962.

Rehearing Denied Jan. 24, 1962.

**300**

Taylor & Tyler, Austin, for appellant.

Byrd & Davis, Austin, for appellee.

HUGHES, Justice.

This is a Workmen's Compensation case in which the only point presented here is whether or not the Trial Court correctly refused to permit appellant, Hardware Mutual Casualty Company, to plead, and to introduce evidence in support thereof, the question of whether a surgical operation if performed upon appellee, Mrs. Claudine Courtney, will effect a cure or will materially and beneficially improve her physical condition.

Mrs. Claudine Courtney was an employee of Gem Fabric Shop in Travis County, Texas, when, October 5, 1959, she was accidently injured while in the course and scope of her employment. She is joined in this action by her husband, E. L. Courtney.

The case was tried to a jury which resulted in verdict and judgment for Mrs. Courtney for compensation for total and permanent disability.

Sustaining appellees' preliminary motion, the Court instructed appellant and its counsel:

"* * * not to mention, refer to, interrogate concerning, or attempt to convey to the jury in any manner, either directly or indirectly, that Claudine Courtney ever refused to submit to a myelogram or surgery, or that an operation may cure or benefit her condition, without first obtaining permission of the court outside the presence and hearing of the jury, and the defendant and its counsel are further instructed to warn and caution each and every one of its witnesses to strictly follow these instructions."

The permission mentioned was not obtained. Appellant did, however, offer evidence in the jury's absence in support of its bill of exception to the effect that Mrs. Courtney would be materially benefited by surgery.

The injury sustained by Mrs. Courtney was to her back. It resulted in a lumbar disc protrusion.

The solution of the problem presented requires a detailed statement of the activities

of the parties before the Industrial Accident Board made its final award.

Commencing October 5, 1959, the date of injury, Mrs. Courtney was paid compensation by appellant for 33 weeks, through June 13, 1960. These payments were stopped by appellant, as testified by its adjuster, Edward Ray Mount, because

"We discontinued it based on the medical reports received from Dr. Esquivel and also Dr. Tisdale to the effect that this was merely a lumbar sprain, and also from my own personal knowledge that Mrs. Courtney had ceased receiving any medical attention whatsoever for this alleged injury."

In its notice to the Board that compensation payments had been stopped appellant stated as its reason "Doctor indicated claimant is no longer disabled and medical treatment has ceased."

The doctors named by Mr. Mount were the only doctors who saw Mrs. Courtney during this period, and they were selected by appellant, who paid their fees and charges. Mrs. Courtney subsequently saw Dr. Albert A. LaLonde at the suggestion of Dr. Tisdale. This was in January, 1961.

Dr. Esquivel in his report dated March 18, 1960, stated:

"Although her symptoms did not suggest an intervertebral disc lesion, allowing her the benefit of the doubt, I recommend she be examined by a neurosurgeon and perhaps have myelogram studies made to rule out such a lesion."

On October 21, 1960, an attorney for appellant wrote the Board as follows:

"The insurer advises that weekly compensation was discontinued because the claimant has not been back for any further treatment to the attending physician, Dr. S. Esquivel, orthopedic surgeon, here in Austin, since December 11, 1959, and, as far as we can determine, has not been seen by any other doctor except Dr. Albert A. Tisdale, another orthopedic surgeon, here in Austin, on March 28, 1960.

"It therefore appears that this claimant has been overpaid for temporary total incapacity, not having reported back for treatment since December 11, 1959, and we have no evidence that the claimant should have any residual disability or loss of earning power whatever.

"The insurer advises that, to their knowledge, none of the doctors who have seen the claimant have at any time recommended surgery, and we have no medical information to indicate that the claimant requires surgery.

"However, we at this time are giving notice, through your Honorable Board, that if claimant's attorney has any evidence or any information indicating that this claimant requires surgery, then the insurer hereby tenders the claimant a surgical operation at the hands of Dr. S. Esquivel, Austin, Texas, or at the hands of any other doctor designated by your Honorable Board."

Mrs. Courtney, through her attorney, replied to this letter by a letter addressed to the Board, dated October 22, 1960, from which we quote:

"The medical report of Dr. S. Esquivel dated March 18, 1960, a copy of which was sent to the carrier, recommended that the claimant have a myelogram in order to rule out an intervertebral disc lesion.

"The report of Dr. Albert A. Tisdale dated June 8, 1960, to the carrier also mentions the possibility of a disc protrusion.

"The carrier has not paid weekly compensation since June 13, 1960, and has not offered, tendered, or suggested any further medical treatment.

"While at the present time neither Dr. Esquivel nor Dr. Tisdale have recommended surgery, their reports indicate the distinct possibility that the claimant has a disc protrusion which may necessitate surgery in the future.

"Since the carrier ceased weekly compensation on June 13, 1960, the claimant was forced to seek a hearing of her claim in order to obtain the compensation to which she is entitled.

"If the carrier will bring the claimant's weekly compensation up to date and continue to pay such compensation until it is definitely determined whether or not the claimant's condition requires surgical intervention, claimant will have no objection to the postponement of this hearing. However, since the claimant is still unable to work she has no alternative than to proceed with the hearing unless she receives the weekly compensation to which she is entitled.

"Claimant also wishes to point out that one of the first requirements necessary in order for the carrier to demand that the claimant submit to surgical operation is the continued payment of weekly compensation."

In similar manner this letter was replied to by appellant on October 24, 1960, from which we quote:

"We are in receipt of copy of Attorney Tom Davis' letter to your Honorable Board dated October 22, 1960, with reference to the insurer's tender of surgery filed October 21, 1960. We note that Attorney Davis requests a myelogram in accordance with Dr. Esquivel's report of March 18, 1960.

"We were of the impression that a myelogram was merely a diagnostic procedure which is a part of the preparation for surgery since most doctors carry out a myelogram to determine where they will operate. We therefore felt that a tender of a myelogram

was embraced in the insurer's tender of surgery filed October 21, 1960.

"However, in view of Attorney Davis' request for a myelogram and his further request that weekly compensation be continued until it is determined whether or not the claimant requires surgery, we accordingly, hereby tender the claimant a myelogram at the expense of the insurer at the hands of Dr. S. Esquivel, Orthopedic Surgeon, 1306 Rio Grande Street, Austin, Texas, or at the hands of any other doctor designated by your Honorable Board in the event that Dr. Esquivel is not acceptable to the claimant and her attorney. The insurer also offers to resume the payment of weekly compensation when the claimant reports for the myelogram and to continue the payment of weekly compensation until the claimant is released by Dr. Esquivel, or any other doctor designated by your Honorable Board to carry out the myelogram, in the event that Dr. Esquivel is not acceptable to the claimant and her attorney.

"We request that your Honorable Board take no further action in the case until the claimant and her attorneys advise your Honorable Board and the insurer whether or not they will accept the insurer's tender of myelogram and surgery."

Similarly reply was made for Mrs. Courtney on October 25, 1960, as follows:

"Apparently the carrier has misinterpreted claimant's letter of October 22, 1960, and, having misinterpreted such letter, has misstated its contents.

"Claimant is not requesting a myelogram or surgery unless it is the opinion of either Dr. Esquival or Dr. Tisdale that a myelogram or operation will effect a cure or will materially and beneficially improve claimant's condition and that a myelogram or operation is advisable at this time. Claimant has no de-

sire to submit to a myelogram or surgery merely to satisfy the carrier's curiousity or in compliance with its 'tactical defense.'

"As stated in her previous letter, the claimant is willing to agree to a postponement of this hearing if, and only if, the carrier brings her weekly compensation payments up to date and continues to pay her weekly compensation until it is definitely established whether or not surgery is advisable. While not clear on this point, the carrier's letter of October 24, 1960, appears to offer the payment of weekly compensation only during the time required to perform and recuperate from a myelogram. This offer obviously does not meet the legal requirement that the continued payment of weekly compensation is a prerequisite to the carrier's demand for surgery."

We quote from appellant's reply to this letter:

"Reference is made to our brief submitted on hearing date in which we requested that action be withheld until the claimant's attorney advised whether or not the claimant would accept the insurer's tender of myelogram and surgery.

"We are in receipt of copy of the attorneys letter to your Honorable Board of October 25, 1960, from which you will note that the attorney and the claimant have not accepted the insurer's tender.

"As pointed out in our brief, the insurer has paid 33 weeks compensation in this case up to June 13, 1960, but this claimant has not even been back for any medical treatment by Dr. Esquivel since December 11, 1959, and hasn't been seen by any doctor since March 28, 1960.

"The insurer discontinued weekly compensation in this case because the claimant had apparently recovered and hadn't reported back for treatment in over six months.

"We, therefore, contend that this claimant has been overpaid for temporary total incapacity, and we certainly deny that she has any residual disability, or any loss of earning power.

"Inasmuch as this claimant has not reported back for any further treatment in over nine months, now, and does not want myelogram or surgery, we request that your Honorable Board proceed to a final award denying further recovery in this case."

On November 3, 1960, the Board entered its final order on Mrs. Courtney's claim, from which we quote:

"That following infliction of injury, named insurer assumed liability and made payments of compensation. That named employee and her attorneys have failed to establish by proof that she suffered further disability than that for which compensation has heretofore been paid. Therefore, claim for additional compensation is denied.

"That named employee has no loss in wage earning capacity."

Shortly before trial, Dr. LaLonde requested that Mrs. Courtney undergo a myelogram, which she did at appellant's expense. This test showed, as Dr. LaLonde testified, a lumbar disc protrusion.

In American General Insurance Company v. Quinn, 277 S.W.2d 223, Tex.Civ.App., writ ref., N.R.E., the Court in discussing the admissibility of evidence of the beneficial effects of an unperformed operation in a Workmen's Compensation case and in construing Sections 12b and 12e of the Act (Art. 8306, Vernon's Ann.Civ.St.) stated:

"Therefore, we hold that the two sections, 12b and 12e, must be construed together. In doing so, we find that under said sections of said article that the following steps are mandatory before a compensation carrier would be

entitled to make such proof: (1) Admit liability; (2) tender the operation to the employee while the claim is pending before the Board; (3) if the employee refuses the operation, make a demand to the Board to require the examination, or examinations, required by the law; and (4) show that the examination or examinations were had and the action of the Board thereon. Having complied with the requirements of the statutes, the insurer would then be entitled to appeal from any refusal of the employee and any adverse ruling by the Board and to re-try any issue decided adversely to it by the Board and would certainly be entitled to prove the benefits of an operation in the event the employee refused the same."

This case was cited, followed, and we believe generally approved, by the Supreme Court in Truck Insurance Exchange v. Seelbach, 161 Tex. 250, 339 S.W.2d 521. See also Texas Employers' Insurance Association v. Shelton, 161 Tex. 259, 339 S.W.2d 519, Texas Supreme Court, where the Court stated:

"The tender of an operation without the admission of liability renders testimony relating to the beneficial effects of an operation inadmissible on the trial of the case on appeal."

It is our opinion that appellant did not, while this claim was before the Board, make an "admission of liability" within the meaning given such phrase by the courts, nor within the meaning of the statutes from which its substance is derived.

Art. 8306, Sec. 12b, V.A.C.S., applicable solely to hernia, provides in part: "In all such cases where liability for compensation exists, * * *." the association shall provide surgical treatment.

■ Sec. 12e, of such Article, applicable here, provides, in part:

"In all cases where liability for compensation exists for an injury sustained by an employé in the course of his employment and a surgical operation for such injury will effect a cure of the employé or will materially and beneficially improve his condition, the association or the employé may demand that a surgical operation be had upon the employé as herein provided * * *."

These statutes constitute the basis of the Court phrase "admission of liability." What does the phrase mean? A mere admission that the insurer is liable for such disability as the employee may ultimately establish? If so, it would, in most cases, be a rather innocuous admission. We believe it can only import an admission of liability for compensation for a specific disabling physical condition for which surgery is tendered to remedy.

Under Sec. 12b, supra, the admission of liability must be for hernia, National Mutual Casualty Co. v. Lowery, 136 Tex. 188, 148 S.W.2d 1089. We quote from that case:

"The Casualty Company earnestly insists that the above holding leads to great injustice to compensation insurance carriers because it compels them to admit liability in all hernia cases, or run the risk of being held liable for general injuries if the case goes to court. We freely admit that our construction of the statute leads to just such conclusion."

The holding was approved in Seelbach, supra.

Our construction of Sec. 12e, supra, is compelled by its own language and by the decision of the Supreme Court in Seelbach.

The statute plainly states that the existent liability must be for an "injury" for which a "surgical operation" will prove beneficial.

Unless the nature of the injury is known or admitted, then the proffer of surgery is meaningless, unless it could be said that surgery is beneficial for all ailments. The mere tender of surgery, of itself, is an admission of nothing.

We quote from Seelbach:

"While § 12b is applicable only to an inguinal hernia and provides that the Board initiate the steps preliminary to an operation for that kind of injury, and § 12e relating to all other injuries is permissive and optional in that respect, all of that creates no distinction so far as the admissibility of this testimony is concerned. Section 12e concludes as follows:

" 'The results of such operation, the question as to whether the injured employee shall be required to submit thereto and the benefits and liabilities arising therefrom shall attach, be treated, handled and determined by the Board in the same way as is provided in the case of hernia in this law.'

"It must be conceded, we think, that in the case of an inguinal hernia where liability has not been admitted and the order for an operation has been refused by the insurer, testimony would not be admitted on appeal to prove that an operation would be successful and the disability reduced accordingly. *Then it is difficult to see how or why it would be admissible in the case of any other kind of injury.* The controlling principle is the same." (Italics ours.)

Conceding, without deciding, that appellant made an unconditional tender of surgery to remedy a protruding disc, it is undisputed that appellant at no time while this claim was before the Board admitted that Mrs. Courtney suffered this infirmity. In fact, it consistently denied this nature of her injury.

Being of the opinion that appellant did not make the requisite admission of liability in order to invoke the procedures of Sec. 12e, supra, it is unnecessary for us to pass upon the remaining requirements laid down in Quinn, supra.

The judgment of the Trial Court is affirmed.

Affirmed.

RICHARDS, Justice (dissenting).

The majority opinion holds that appellant did not, while this claim was before the Board, make "an admission of liability" within the meaning given such phrase by the courts nor within the meaning of the statutes from which its substance is derived. Being unable to agree with this conclusion, I respectfully dissent.

The majority holding is based upon the opinions of the Supreme Court of Texas in Truck Insurance Exchange v. Seelbach, 161 Tex. 250, 339 S.W.2d 521, and Texas Employers' Insurance Ass'n v. Shelton, 161 Tex. 259, 339 S.W.2d 519 and the Tex. Court of Civ. App. in American General Insurance Co. v. Quinn, 277 S.W.2d 223, error ref., N.R.E. It should be noted that in the Seelbach case the insurer did not admit liability. In addition no operation was tendered or requested by the insurer before the Industrial Accident Board and no surgery indicated.

The opinion in the Seelbach case cited and apparently approved the opinions in Texas Employer's Ins. Ass'n v. Kubiak, Tex.Civ.App., 276 S.W.2d 909, error ref., N.R.E., General Accident Fire and Life Ass'n v. Coffman, Tex.Civ.App., 326 S.W.2d 287, error ref., N.R.E. and American General Ins. Co. v. Quinn, supra.

In the Kubiak case the insurer did not admit but denied liability. In addition the claimant was never tendered an operation prior to the Board's final award and the Board never ordered one. In the Coffman case the tender of the operation was made after the Industrial Accident Board had entered its final order and appeal had been perfected to the District Court. In the Quinn case the insurer denied liability throughout the entire period and did not tender an operation while the claim was pending before the Board.

In Texas Employers' Ins. Ass'n v. Shelton, supra, liability was not assumed by

the insurer although surgery was tendered by the insurer to the claimant which was refused. No examination to determine the advisability of surgery was ordered by the Board and some time thereafter the Board "finding that no proof had been offered showing that Shelton's condition was the result of an accidental injury suffered in the course of his employment" denied his claim and Shelton appealed to the courts. The Supreme Court held that while the Shelton case differed factually in some respects nevertheless it was controlled by the opinion in the Seelbach case, stating that the tender of an operation without the admission of liability renders testimony relating to the beneficial effects of an operation inadmissible in the trial of the case on appeal.

The majority opinion also cites National Mutual Casualty Co. v. Lowery, 136 Tex. 188, 148 S.W.2d 1089, cited and approved in the Seelbach case, but neither before nor during the proceedings before the Board did the insurer acknowledge any liability to Lowery or tender him a surgical operation.

The facts in the instant case are materially different from the facts in any of the cases cited in the majority opinion in support of its holding. In addition to the statement of the factual situation in the majority opinion, it should be noted that after appellant had paid appellee compensation for 33 weeks from October 5, 1959, the date of the injury, through June 13, 1960, in addition to fees for medical services, hospital bills and other medical expenses, the payments were stopped by appellant by filing with the Industrial Accident Board its Form A2 in accordance with Sec. 11, Art. 8307, V.C.S., on June 14, 1960, notifying the Board that payment of compensation had stopped as of June 13, 1960 for the reason that "doctor indicated claimant is no longer disabled and medical treatment has ceased."

Edward Ray Mount, appellant's adjuster, testified that the compensation was discontinued on June 13, 1960 on the basis of the medical reports from Dr. Esquivel and Dr. Tisdale to the effect that the injury was a lumbar sprain and also from his personal knowledge that appellee had ceased receiving any medical attention whatsoever, and that appellant did not make any further payments because there was no medical evidence upon which appellant should start making payments again. The witness further testified:

"Q. Did you ask Mrs. Courtney to go for a medical examination?

"A. I discussed that particular matter with her attorney, Mr. Davis.

"Q. What was the outcome of that discussion?

"A. At that particular time, Mr. Davis did not see fit to discuss it at extreme lengths.

"Q. But you felt you had to bring the matter to a head, so you discontinued the payments at that time?

"A. Yes, sir, we did.

"Q. Mr. Mount, since the beginning of this case, have you ever denied liability in the case?

"A. No, sir, we have not."

Dr. LaLonde, appellee's witness, testified on cross examination by appellant's counsel for the purpose of appellant's bill of exception as follows:

"Q. What would be your professional opinion, based on Mrs. Courtney's condition? Do you think she would successfully recuperate from such an operation so that she would no longer be even temporarily or partially disabled?

"A. Well, if Mrs. Courtney asked that question, 'Doctor, will I be perfectly all right after this operation? Will I be free of back and leg pain? Will I be able to do any kind of work?' I would say, 'No.' I will not state that to you. You know that no doctor can forecast the outcome of an operation.

"Q. I didn't ask you if you would guarantee results. I was asking you if it would be reasonably anticipated, in view of the fact that 85 percent of your patients recover from such an operation.

"A. Yes; it would be reasonably anticipated that she would probably be relieved of her back and leg pain.

"Q. Is there anything, in your opinion, that would place her outside of the category of 85 percent of the people who do recover?

"A. There is no way of knowing in any case whether a patient will get an excellent result or not. You cannot tell by the myelogram or by the symptoms.

\* \* \* \* \* \*

"Q. And how long would it take the plaintiff to recuperate from such an operation if it were successful before she could get back to performing her normal duties?

"A. If she followed the usual course, she could get back to work in about three months."

While appellee's claim waas pending before the Industrial Accident Board appellant tendered appellee a myelogram at its expense at the hands of Dr. Esquivel or any other doctor indicated by the Board in the event that Dr. Esquivel was not acceptable to appellee and her attorney but the offer was refused by appellee unless appellant paid weekly compensation payments from June 13, 1960 to October 25, 1960 and would continue to pay such compensation until it was definitely established whether surgery was or was not advisable. Appellant then advised the Board that since appellee had not reported to the doctor for further treatment in over nine months and did not wish a myelogram or surgery, it requested the Board to proceed to a final award denying further compensation to appellee.

On November 3, 1960 the Board entered its final order which stated that although the insurer had assumed liability and made payments of compensation following the injury, appellee and her attorney failed to establish by proof that she had suffered further disability than that for which compensation had been paid and therefore claim for additional compensation was denied. In entering such order the Industrial Accident Board failed to follow the mandatory provisions of Sec. 12e, Art. 8306, V.C.S., which provides that where liability for compensation exists for injury sustained by an employee in the course of employment and a surgical operation for such injury will effect a cure of the employee or materially improve his condition, the association or the employee may demand that a surgical operation be had upon the employee and the association shall provide and pay for the necessary surgical treatment, medicines and hospital services incident to the performance of the operation.

Sec. 12e then provides:

"In case either of said parties demands in writing to the board such operation, the board shall immediately order a medical examination of the employé in the same manner as is provided for in the section of this law relating to hernia. If it be shown by the examination, report of facts and opinions of experts, all reduced to writing and filed with the board, that such operation is advisable and will relieve the condition of the injured employé or will materially benefit him, the board shall so state in writing and upon unanimous order of said board in writing, a copy of which shall be delivered to the employé and the association, shall direct the employé at a time and place therein stated to submit himself to an operation for said injury. If the board should find that said operation is not advisable, then the employé shall continue to be compensated for his incapacity under the general provisions of this law. If

the board shall unanimously find and so state in writing that said operation is advisable, it shall make its order to that effect, stating the time and place when and where such operation is to be performed, naming the physicians therein who shall perform said operation, and if the employé refuses to submit to such operation, the board may order or direct the association to suspend the whole or any part of his compensation during the time of said period of refusal. The results of such operation, the question as to whether the injured employé shall be required to submit thereto and the benefits and liabilities arising therefrom shall attach, be treated, handled and determined by the board in the same way as is provided in the case of hernia in this law."

In the instant case although demand in writing was made by appellant to the Board for a myelogram and a surgical operation if necessary, the Board failed to *immediately* order a medical examination of appellee provided for in Sec. 12e but instead denied appellee's claim for additional compensation.

Since the Workmen's Compensation Law is in derogation of the common law, the rights and obligations of the parties in a suit brought thereunder are controlled by its provisions and where the statute directs that action be taken in a certain way, it may be performed in no other manner. Truck Insurance Exchange v. Seelbach, supra. In entering its final order denying appellee further compensation instead of complying with the mandatory provisions of Sec. 12e by ordering an immediate examination of appellee after appellant had made its offer and tender of a myelogram and a surgical operation if necessary, the Board failed to follow the procedure outlined in the statute and the order was not a final order. Tally v. Texas Employers' Ins. Ass'n, Tex. Comm.App., 48 S.W.2d 988; Petroleum Casualty Co. v. Webb, 127 Tex. 91, 92 S.W. 2d 236. However, appellee served notice

of appeal therefrom and perfected her appeal to the District Court having jurisdiction of any proper appeal from a final order of the Board.

In Texas Employer's Ins. Ass'n v. Chancellor, Tex.Civ.App., 292 S.W.2d 360, 362, error ref., N.R.E., which was cited and distinguished in Texas Employers' Ins. Ass'n v. Shelton, supra, the injured employee perfected an appeal from a purported final order of the Industrial Accident Board which awarded fifty-two weeks of compensation as provided in Sec. 12e but with a finding that the employee had failed and refused to undergo an operation as ordered by the Board. On appeal to the District Court the insurer pleaded defensively that it had demanded that a surgical operation be had upon the employee as provided by Sec. 12e and the Board had ordered the employee to submit to an operation which the employee refused. The employee excepted to the defensive pleading upon the ground that no proper defense was stated because it appeared that neither the Company nor the Board had observed the requirements of Secs. 12b and 12e, Art. 8306, with respect to requiring the employee to submit to a surgical operation. The Trial Court sustained the exception and refused to permit the insurer to introduce evidence in support of its defense upon the trial.

The Court held in part as follows:

"We believe that when an insurance company follows the procedure prescribed by Section 12e and demands that a surgical operation be had, it becomes entitled to an issue on trial de novo upon the matter of whether such an operation would be 'not more than ordinarily unsafe', in the event such operation is expressly or constructively refused by the injured employee.

\*    \*    \*    \*    \*    \*

"We do not understand the employee to challenge the jurisdiction of the trial court, invoked by him when he perfected an appeal in this case from an order final on its face. The insurance

company has not challenged the trial court's jurisdiction. It is well settled that the Workmen's Compensation Law is to be given a liberal construction, and incident thereto we are satisfied that attention to such principle would persuade a holding in this case that the Industrial Accident Board did become vested with authority to enter a final order premised upon the refusal of the employee to abide by a valid operation order. To attribute invalidity to either the order for an operation or to the Board's final order would be to force the employee's case back into the hands of the Industrial Accident Board. It is often stated that 'justice delayed is justice denied', and from the record in this case it is apparent that should we hold that the trial court was without jurisdiction, thus returning the employee's claim to the Industrial Accident Board for more meticulous attention to form in its procedure pursuant to ordering an operation, only the employee would suffer prejudice. Yet, such a holding on our part would appear as the only alternative to that we believe correct, i. e., that the insurance company is entitled to have the cause remanded to the court below for a trial on the merits, in the course of which it should be permitted to try out the issue of whether the operation demanded by it, or ordered by the Board, would not have been more than ordinarily unsafe."

and reversed and remanded the cause for a new trial. Traders & General Ins. Co. v. Wilkinson, Tex.Civ.App., 261 S.W.2d 863, error ref., N.R.E. Cf. De Leon v. Western Casualty Co., Tex.Civ.App., 114 S.W.2d 274, no writ history, and Western Casualty Co. v. De Leon, Tex.Civ.App., 148 S.W.2d 446, error dism.

Here appellant affirmatively pleaded as a defense in paragraph III of its first amended answer that it tendered appellee a surgical operation in accordance with law on October 21, 1960 (while the claim was still pending before the Board) but that appellee refused even to have a myelogram made until March 13, 1961 (after this suit was filed and appellee's motion in limine had been filed but not ruled upon by the Trial Court); that appellee had not suffered any injury which is permanent in nature and if given an operation she would be able to perform the usual duties of a working woman and the disability complained of which is partial and temporary would be completely removed by the operation, and that it had complied with all laws requiring the curative effects of such an operation as shown by the certified copies of the proceedings before the Industrial Accident Board attached to the answer.

Appellee's motion in limine was heard by the Court on February 27, 1961 and on March 21, 1961 the motion was granted as shown in the majority opinion. Appellant excepted to the motion and presented its bill of exception on the trial of the case in which bill of exception the proceedings before the Industrial Accident Board were introduced, together with the testimony of appellee's witness, Dr. LaLonde, on cross examination set forth in part supra.

It is my opinion that the principles of law enunciated in the Chancellor case are applicable to the case at bar. The purported final order of the Board in the Chancellor case was defective as is the purported final order in this case. Appellee's refusal to submit to the myelogram and a surgical operation if the myelogram should disclose its necessity, unless appellant paid appellee the weekly compensation from June 13, 1960 to the time of and continuing while appellee submitted to the myelogram and the results thereof were ascertained, constitutes no legal ground for such refusal. I fail to find any statutory provision in the Workmen's Compensation Law which would authorize an injured employee to refuse to submit to a myelogram and a surgical operation if necessary unless the weekly compensation allegedly in arrears was paid to the employee.

On the contrary, Section 11, Art. 8307, V.C.S., specifically authorizes the association to discontinue payments by notice to

the Board giving the reason for such discontinuance. In case the association fails or refuses to pay compensation when the same matures, it is the duty of the Board to notify the association and if after such notice the association refuses to make the payments as provided, the Board shall certify such fact to the Commissioner of Insurance as a ground for revoking or forfeiting the permit or license of the association to do business in Texas. Sec. 18, Art. 8306. This is a drastic penalty.

Appellant having complied with the provisions of Sec. 11, Art. 8307 by notifying the Board that it had discontinued the payments to appellee because the doctor indicated that appellee was no longer disabled and medical treatment had ceased, it then became appellee's duty to request the Board for a hearing as to the justification for appellant's refusal to make further payments, which was done in this case. Upon the hearing the Board found as a fact that appellee had failed to establish that she had suffered no further disability than that for which compensation had been paid and denied appellee's claim for additional compensation.

Since the Workmen's Compensation Law is to be given a liberal construction, it is clear that both the injured employee and the insurer have equal rights to have their respective interests protected in the courts. If the injured employee is dissatisfied with the medical diagnosis or treatment received from the physician selected by the insurer, such employee may request the insurer to designate another physician and if such request is refused then the employee may provide such medical aid and other services at the expense of the insurer under the provisions of Sec. 7, Art. 8306. Here appellee was last examined by Dr. Esquivel on December 11, 1959 except for one visit to Dr. Tisdale on March 28, 1960. If appellee was dissatisfied with the diagnosis and methods of treatment prescribed by these physicians, she owed a duty to the insurer to request the designation of another physician for further diagnosis and treatment, which she did not do. In my opinion the appellant insurer assumed all liability which was required under the provisions of the Workmen's Compensation Act.

Applying the principles set forth in American General Ins. Co. v. Quinn, supra, which principles were evidently approved by the Supreme Court of Texas in Truck Insurance Exchange v. Seelbach and Texas Employers' Ins. Ass'n v. Shelton, supra, and construing Secs. 12b and 12e, Art. 8306 together, it seems clear that appellant (1) admitted liability, (2) tendered the operation to appellee while her claim was pending before the Board, and (3) when appellee refused to submit to a myelogram and an operation if necessary made a demand to the Board to require appellee to submit to an examination under the provisions of Sec. 12e. Appellant could not comply with the fourth requirement by showing that the examination was had and the action of the Board thereon since the Board itself failed to immediately order the medical examination of appellee as required by law. Instead the Board at the request of appellant found as a fact that appellee had failed to establish that she had suffered further disability than that for which compensation had already been paid and denied further compensation, which order was entered as requested by appellant.

Since in my opinion the Trial Court committed error in sustaining appellee's motion in limine and refused to permit appellant to submit to the jury the evidence contained in its bill of exception for the purpose of showing whether the operation demanded by it would have been "not more than ordinarily unsafe" and would have partially if not totally removed the appellee's disability, I would reverse the judgment and remand the cause to the Trial Court for trial on the merits in the course of which appellant should be permitted to submit evidence upon the issue as to whether the operation proffered by it to appellee would be "not more than ordinarily unsafe" in view of the refusal of appellee to submit thereto.