**HARDWARE MUTUAL CASUALTY CO.,**
Petitioner,

v.

**Claudine COURTNEY et vir, Respondents.**

No. A–8843.

Supreme Court of Texas.

Jan. 9, 1963.

Taylor & Tyler, Austin, for petitioner.

Byrd & Davis, Austin, for respondents.

GREENHILL, Justice.

This is a workmen's compensation case. The question is whether the trial court acted correctly in instructing counsel for the insurer not to mention to the jury that the injured employee ever refused to submit to a myelogram or surgery or that an operation might cure or benefit her condition. The answer to this question depends upon whether the insurer properly demanded or tendered an operation and whether it admitted liability in such a way as to make the proffered testimony admissible.

After a trial by jury, the employee recovered a judgment for total and permanent disability. The action of the trial court was affirmed by the Austin Court of Civil Appeals, one justice dissenting. 353 S.W.2d 299.

■ The general problem presented here has been before this Court in three recent cases: Truck Insurance Exchange v. Seelbach, 161 Tex. 250, 339 S.W.2d 521 (1960); Texas Employers' Insurance Association v. Shelton, 161 Tex. 259, 339 S.W.2d 519

(1960); and Cook v. City of Austin, 161 Tex. 294, 340 S.W.2d 482 (1960). In Shelton, the insurer tendered an operation and requested the Board to order a medical examination if the employee refused to submit to an examination. Though the insurer by implication assumed the expense of the operation, it did not admit general liability. In Seelbach, no surgery was recommended, tendered, or demanded while the employee's case was before the Board. The need for an operation did not become apparent until after the Industrial Accident Board's award became final. In Cook, the employee was said to have knowledge, while his case was before the Board, that surgery would help him. But no operation was tendered or demanded while his case was before the Board. In all three of these cases, it was held that the trial court correctly excluded evidence similar to that proffered here. In these three cases, this Court had before it the line of cases including the Quinn and Kubiak cases, and the ruling substantially to the contrary by the Fifth Circuit in the Bellah case.[1] It chose to follow Quinn and Kubiak. And in Seelbach, Shelton, and Cook, this Court held that for the insurer to be in a position to offer the testimony, it must have (1) admitted liability and (2) tendered an operation to the employee, and (3) the tender must have been made while the matter was still before the Board and before the Board's award had been finally made.

It will be helpful, in considering the facts set out below, to keep in mind the steps set out in Quinn to enable the insurer to get in this testimony:

1. The insurer must admit liability;

2. It must tender an operation while the claim is pending before the Board;

3. If the employee refuses the operation, the insurer must make a

1. Texas Employers Insurance Ass'n v. Kubiak (Tex.Civ.App.1955), 276 S.W.2d 909, writ ref., N.R.E.; American General Insurance Co. v. Quinn (Tex.Civ.App.1955), 277 S.W.2d 223, writ ref., N.R.E.; National Surety Corp. v. Bellah (5th Cir., 1957), 245 F.2d 936.

demand to the Board to require the examination; and

4. The insurer must show the examination was had and the action of the Board thereon.

The facts in this case and the voluminous correspondence between counsel for plaintiff and counsel for the insurer are set out at length in the opinion of the Court of Civil Appeals, 353 S.W.2d 299 to 303, and only the substance thereof will be repeated here.

Mrs. Claudine Courtney injured her back while at work in October of 1959. The insurer assumed liability and paid her weekly compensation for 33 weeks plus medical expenses. During that time, she was sent by the insurer to Doctors Esquivel and Tisdale who considered that she had only a back strain. In March of 1960, before her payments were stopped in June of 1960, Dr. Esquivel reported that although he did not think Mrs. Courtney had a disc lesion, he recommended to the carrier and to claimant's attorney that she be examined by a neurosurgeon and "perhaps have myelogram studies made to rule out such a lesion." She was not sent to a neurosurgeon and no myelogram was run at that time.

In June of 1960, while the matter was still before the Board, the insurer stopped making compensation payments. It wrote the Board that it was stopping because, based on its doctors' reports, Mrs. Courtney merely had a lumbar strain and had ceased receiving any medical attention; that the doctors had indicated that the claimant was no longer disabled. While it does not clearly appear, it is apparent that Mrs. Courtney thereafter asked the Board to require the insurer to continue making payments.

On October 21, 1960, counsel for the insurer again wrote the Board that it had stopped payments for the above reasons; that it appeared that "this claimant has been overpaid" because she hadn't reported for treatment since December 11, 1959, "and we have no evidence that the claimant should have any residual disability or loss of earning power whatever." It stated that none of the doctors had recommended surgery, and it had no information that she required surgery. Then follows language which is pertinent on tender of an operation:

"However, we * * * are giving notice, through your Honorable Board, that if claimant's attorney has any evidence or any information indicating that this claimant requires surgery, then the insurer hereby tenders the claimant a surgical operation at the hands of Dr. S. Esquivel. * * *"

Mrs. Courtney's attorney replied on October 22, 1960, that Dr. Esquivel had recommended a myelogram on March 18, 1960, and that Dr. Tisdale's report of June 8, 1960, suggested the possibility of a disc protrusion; but that the insurer had not paid Mrs. Courtney any compensation since June 13, 1960, or suggested any further treatment. He said, however, that he would agree to postpone the hearing before the Board to see whether Mrs. Courtney's condition required an operation if the carrier would bring her compensation payments up to date and would continue them until it could be definitely determined whether surgery would be required.

Insurer's counsel replied that he interpreted Mrs. Courtney's counsel's letter as requesting a myelogram. He thereupon wrote:

"* * * we accordingly, hereby tender the claimant a myelogram at the expense of the insurer at the hands of Dr. S. Esquivel. * * * The insurer also offers to resume the payment of weekly compensation when the claimant reports for the myelogram and to continue the payment * * * until the claimant is released by Dr. Esquivel * * *."

Mrs. Courtney's counsel replied that his letter had been misinterpreted: "Claimant is not requesting a myelogram or surgery unless it is the opinion of either Dr. Esqui-

vel or Dr. Tisdale that a myelogram or operation will * * * materially and beneficially improve claimant's condition and * * * [is] advisable. * * *" He again expressed a willingness to postpone the hearing before the Board if the insurer brought claimant's payments up to date and continued them "until it is definitely established whether or not surgery is advisable. While not clear on this point, the carrier's letter * * * appears to offer the payment of weekly compensation only during the time required to perform and recuperate from a myelogram."

The insurer's counsel replied by a letter addressed to the Board. He wrote that, "We * * * note that the attorney and the claimant have not accepted the insurer's tender." He again stated that compensation payments had been stopped because Mrs. Courtney had not been seen by any doctor since March 28, 1960, and that she had been paid compensation for 33 weeks [$683]. The letter concludes:

> "We, therefore, contend that this claimant has been overpaid for temporary total incapacity, and *we certainly deny that she has any residual disability, or any loss of earning power.*
>
> "Inasmuch as this claimant has not reported back for any further treatment in over nine months, now, and does not want myelogram or surgery, we request that your Honorable Board proceed to a final award *denying further recovery in this case.*" [Emphasis ours.]

The Board on November 3, 1960, entered its final order. It recited that certain payments had been made, and that the claimant had "failed to establish by proof that she suffered further disability than that for which compensation has heretofore been paid. Therefore, claim for additional compensation is denied."

This suit was then filed as an appeal from this final order of the Board. After the suit was filed and shortly before trial, Mrs. Courtney, at Dr. LaLonde's request and at the expense of the insurer, did undergo a myelogram. It was the opinion of the doctor that the test showed a lumbar disc protrusion.

■ We again refer to the holdings of the cases set out above. Has the insurer done those things which are required of it to make the proffered testimony admissible upon the trial? We think that it has not.

Accurately speaking, Section 12e of Art. 8306, Vernon's Texas Civil Statutes Annotated, does not speak in terms of a "tender" of an operation. It provides for a "demand in writing" for an operation followed by a request that the Board require the employee to submit to an examination to see if surgery is desirable and beneficial. We shall refer to the necessity for a *demand* for an operation later herein. But Scelbach and others speak in terms of a *tender*, and we shall assume for the present that an unconditional tender is sufficient for our purposes here.

As pointed out in Seelbach and Shelton, both Sections 12b and 12e say, "In all [such] cases where liability for compensation exists * * *." Then they speak about surgery. These cases then point out that the first thing the insurer must do to make the proffered testimony admissible is to admit liability. The cases have not said what liability must be admitted. The clear import of the cases referred to is that in tendering an operation, liability must clearly be taken out of the case in so far as the surgery is concerned. In Texas Employers' Ins. Ass'n v. Shelton, 161 Tex. 259, 339 S. W.2d 519, the carrier tendered surgery with its expenses but reserved the right to deny liability. This Court said that was not enough.

■ While we would not attempt to prescribe the form for such admission, to remove the question of liability, the insurer would have to admit unequivocally the substance of the following: a compensable injury to the employee in the scope of employ-

ment; liability for the injury for which a surgical operation would or should prove beneficial to the employee; liability for the cost of the operation, including doctors, hospital, medical, and convalescent care as prescribed by the statute and the Board; and liability for the consequences of the operation, within the provisions of the workmen's compensation act. Compare Texas Employers Ins. Ass'n v. Musick (Tex.Civ. App.1961, no writ), 349 S.W.2d 619.

The carrier here fell short of these requirements. First and last, its position was that the claimant had been overpaid and that claimant had no residual disability. In between, it did not unequivocally offer surgery and full responsibility therefor. Neither the insurer nor its doctors recommended surgery while her case was before the Board. It made an offer to pay compensation during the period beginning when she appeared for her myelogram and continuing until she was released by the doctor. There was nothing said about liability thereafter.

The insurer in its briefs says that this, or at least some of this, is implied in its letters, and that, if not, it would be estopped to deny liability. It is our holding that the tender and admission of liability must not be left to implication and estoppel.

Since we have held that the trial court correctly excluded the proffered testimony for the above reasons, and since the claimant has recovered for total and permanent disability, it is unnecessary for us to decide whether the carrier must also pay compensation continuously from the date of injury to the time of the operation. We reserve that question and express no opinion thereon.

 The insurer contends that it is being penalized because of the *Board's* failure to act; that it was the Board's duty to require an examination and surgery, if it was found to be necessary. There are at least two answers: first, as above referred to, the statute [12e] speaks in terms of a *demand in writing* for surgery. When a demand in writing has been made, *then* it is the duty of the Board to order a medical examination of the claimant. If the Board unanimously finds that surgery is desirable, it may direct the claimant to submit to an operation. The insurer requested none of these steps here as the carrier did in Shelton. Second, the carrier itself represented to the Board that Mrs. Courtney had been overpaid, "does not want a myelogram or surgery, and we request that your Honorable Board proceed to a final award denying further recovery in this case." The carrier is simply not in a position to lay this matter at the feet of the Board. The steps to be followed by the carrier were pointed out in the Quinn case which are set out above. They were not followed. By the above we do not hold that to make the proffered testimony admissible, the carrier must make a demand in writing for an examination or operation. The holding is that before the insurer may excuse itself and place the responsibility on the Board, it must follow the steps outlined in the statute.

The judgments of the courts below are affirmed.